## THE MUIRFIELD.

(District Court, N. D. Florida. November 13, 1909.)

1. SHIPPING (§ 49*)—CONSTRUCTION OF CHARTER PARTY—DISPATCH MONEY.

   A provision of a charter party for the allowance to the charterer of dispatch money for lay days saved in loading construed.

   [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 49.*]

2. SHIPPING (§ 50*)—CONSTRUCTION OF CHARTER PARTY—LIABILITY FOR TONAGE DUES.

   Under a provision of a charter party requiring the charterer to pay tonnage dues, he was liable for such dues actually imposed, although based on a resurvey by the customs officers while in port, which gave the vessel an additional tonnage over that shown by her British registry.

   [Ed. Note.—For other cases, see Shipping, Dec. Dig. § 50.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by W. L. Wittich, as W. L. Wittich & Co., against the British steamship Muirfield, and cross-libel by the master of the steamer. Decree for cross-libelant.

Reeves & Watson, for libelant.
Blount, Blount & Carter, for cross-libelant.

SHEPPARD, District Judge. W. L. Wittich libeled the British steamship Muirfield, which he had loaded with cargo pursuant to charter, and claims by his libel a balance due him on account of dispatch money earned because of time saved to the vessel out of the lay days allowed in the charter party for loading cargo.

The master of said steamer filed a cross-libel, asserting that, notwithstanding the charter party provided that the charterer, Wittich, should pay all the tonnage dues and port charges, he had refused to pay the additional tonnage tax assessed by the customs officials here, amounting to $58.38, by reason of the increased tonnage under American remeasurement. The charterer refused to pay this additional tax, because the charter party stipulated the tonnage of the vessel at 1,957 tons British net register. Under the charterer's construction of the charter party, he was required to pay tonnage dues according to the British measurement on a basis of 1,957 tons.

There being no dispute as to the facts, the contentions between the parties are submitted upon an agreed statement of facts; the solution of the question at issue depending wholly upon an interpretation of the charter party. Counsel conceded at the argument the first proposition was entirely unique, and that the most diligent search for authorities had failed to shed any light on the mooted question.

It is agreed that the charterer had 24½ lay days, Sundays and legal holidays excepted, unless used, in which to load the vessel. It is conceded that none of the excepted days were used. It is further agreed that the charterer was to receive 2d. sterling per net register ton per day dispatch money for every day saved, including Sundays and legal holidays. It is agreed that the loading began on the first lay day, which was June 5, 1908, and was finished and the vessel cleared on June 15th, actually consuming nine lay days loading, including the 15th; but it is specially provided in the charter party that the vessel might be cleared on the day the loading was completed without counting it as a lay day, or for dispatch money. Charterer claims 20½ days' dispatch, insisting that, by reason of the above provision, the clearance day was not to be counted in the computation of lay days. The master's contention is that the 24½ days stipulated for began on June 5th, and concluded July 3d at noon; that, notwithstanding the charterer was entitled to 24 hours to clear the vessel, the charterer was not entitled to dispatch money for the excepted holiday and Sunday which intervened between the 3d of July, which was the expiration of the lay days, and Monday, July 6th, the last day for clearance.

By reference to the computation of lay days made by the charterer and used by counsel to illustrate his argument, it will be observed that, by omitting the 15th of the month, the day on which the vessel finished loading, the lay days would have expired Monday, July 6th, at noon,—

thus extending the days saved, for which he would claim dispatch money, beyond the 4th and 5th of July, thereby claiming 20½ dispatch days.

Let us see if a fair and reasonable interpretation of this contract will admit of this construction of the charter party providing for the time to be consumed in loading the vessel.

The rule for ascertaining the intention of parties by such provisions is that, when the time is definitely fixed or described, so as to be calculable beforehand, there is an absolute obligation of the charterer to have the work completed within the period specified, whatever circumstances occur. Now, by reference to the charter party, we find the lay days allowed definitely fixed before the performance of the charter party was entered upon.

The charter provided lay days, at 1¼ per 100 tons net register, Sundays and legal holidays excepted, unless used, which would allow the charterer 24½ days from June 5th, the day the loading began. It will be seen that the 24½ days would have expired on July 3d at noon. According to the general rule for construing such provisions in a charter, the lay days under this contract expired at noon July 3d. A different interpretation of the provision for lay days, it seems, would allow the charterer dispatch money on the fiction that the delayed clearance days, to wit, the 4th and 5th of July, were saved to the ship. A memorandum computation which follows here illustrates the rationale by which is reached the above interpretation of that provision of the charter party.

Lay Days of the British Steamship Muirfield under Charter of May 8, 1908. to W. L. Wittich & Co.

June 4—Notice.
5— 1st lay day.
6— 2d lay day.
7— Sunday.
8— 3d lay day.
9— 4th lay day.
10— 5th lay day.
11— 6th lay day.
12— 7th lay day.
13— 8th lay day.
14—Sunday.
15— 9th lay day—actual clearance day.
16—10th lay day.
17—11th lay day.
18—12th lay day.
19—13th lay day.
June 20—14th lay day.
21—Sunday.
22—15th lay day.
23—16th lay day.
24—17th lay day.
25—18th lay day.
26—19th lay day.
27—20th lay day.
28—Sunday.
29—21st lay day.
30—22d lay day.
July 1—23d lay day.
2—24th lay day.
3—24½—lay day expires at noon. Could clear.
4—Final clearance day.

Days to Which W. L. Wittich is Entitled to Dispatch Money for British Steamship Muirfield.

June 16— 1.
17— 2.
18— 3.
19— 4.
20— 5.
21— 6.
22— 7.
23— 8.
24— 9.
25—10.
June 26—11.
27—12.
28—13.
29—14.
30—15.
July 1—16.
2—17.
3—17½, being entitled to only one-half day.

· The fifteenth clause of the charter party provides that charterers or their agents shall pay wharfage, custom house and quarantine dues, consular fees, pilotage in and out, etc. Charterer paid tonnage dues and port charges estimated on a basis of 1,957 tons British admeasurement, but insists that he is not liable for the additional tonnage tax levied by the customs officials on a resurvey of the vessel while in port, pursuant to the requirements of Rev. St. U. S. § 4153, as amended by Act Aug. 5, 1882, c. 398, § 1, 22 Stat. 300, and Act March 2, 1895, c. 173, § 1, 28 Stat. 741 (U. S. Comp. St. 1901, p. 2812), and section 4154, as amended by Act Aug. 5, 1882, c. 398, § 2, 22 Stat. 300 (U. S. Comp. St. 1901, p. 2821).

It would appear the additional tax is one of the custom house dues that by the terms of the charter were imposed upon the charterer, and, if it were not so intended, charterer should have exempted himself from such alleged extra charges by some definite exception, as that he would be liable only for tonnage dues on the tonnage expressed in the vessel's register.

Giving the clause of the charter as to lay days the construction indicated, and interpreting the provision as to custom house dues to include the legitimate charges made at the custom house necessary to the vessel's clearance, it follows that judgment will have to go against the charterer on his claim for dispatch money for 2½ days, as well, also, as the additional tonnage dues which the master paid.